Good morning, Ryan Kovach here present with or on behalf of Orlando Dones-Vargas. The question is whether the district court abuses discretion in denying my motion for a new trial by not giving significant weight to the cash payments that were provided to this informant three months before trial. This informant was otherwise unimpeachable and provided compelling testimony that corroborated three other lay witnesses, co-conspirators in the case. This is material because there was a reasonable probability of a different verdict, essentially because if the jury believed Ms. Ghost, they would be convicting Dones-Vargas. She was the connection between the three other co-conspirators who testified, bolstering their testimony and giving legitimacy and credibility to it. Were there credibility problems or inconsistencies in the other three witnesses' testimonies that Ghost's testimony was crucial to bolster? And it seems like three independent witnesses testifying, it's sort of hard to see unless there's something weak or inherently suspect about those witnesses' testimonies. The other three witnesses that were considered co-conspirators either were cooperating with the government, were awaiting Rule 35s or had received Rule 35s. I believe that Ms. Ghost, she specifically stated that she corroborated Jose Rivera-Perez multiple times and stated basically they had a close relationship and stated that Jose Maria Rivera-Perez was also involved with this. So when that witness testified, that testimony was already bolstered before he testified. When you have Chua and Luna, who basically I consider to be together because they're both in Vermilion, Ms. Ghost testified that she went on a trip to Vermilion, South Dakota, received methamphetamine, and specifically that she observed a yellow hummer in Vermilion. So then Blanca and Luna come and say, we had a yellow hummer. So she did corroborate specific details, basically stating that what they're going to be testifying is truthful later on. So as the trial proceeded, she was the only government witness that did not seem to have some kind of incentive to testify in, I guess, in exchange for some kind of benefit from the government? Is that correct? I think it was page 21 of the trial transcript, she was asked by the prosecutor, what do you expect for testifying today? And her answer was nothing. But the other three all were cooperators? Correct. And we know that was a lie when she said that she was not going to expect anything because she'd already received cash shortly before. And I believe, as this court has noted in Riskin, that there was essentially an implied understanding that she would be compensated later on. And she was, in the form of the payment to the Yankton County Jail. So we didn't know that at the time. When I was attempting to cross-examine this informant, who under Davis v. Alaska, Bell, and some of these court's decisions with regards to Riskin, we're supposed to have broad latitude with informants. Their credibility is a major issue. We looked at their bias and the motivations behind their testimony. Basically, what I could come up with was that she had received a concurrent state sentence. And that was it. There was no indication, I had no reason to believe that she had been paid cash shortly before. When, in fact, the trial was in January, late January, January 29th. She testified that she had had twins about four months before, and that she had relapsed shortly after having twins. These payments were on November 1st and November 8th, right around the time she relapsed. When you're dealing with cash, completely different than the cases cited by the government, there's no accountability for what purpose this cash is being used for. In fact, there's a very reasonable argument that that money went to methamphetamine. And when she was receiving, essentially, the government's money, funneling it on an accountable, we know that this drug user's credibility is a major issue. It was a relatively small amount of money on three different occasions, and really by the time of trial, it was just two occasions, right? So while that's certainly useful cross-examination, how would that have, in your estimation, have really tipped the scales? Is that enough to sort of topple this whole apple cart? That's really what you have to think about. Yes. In this case, we're talking about $100 or $150. I know in the grand scheme of things, it may not seem as significant. And I understand it was significant to her, but to the jury in sort of assessing? Well, when I think of what it comes down to, she provides information, she gets paid, and when she comes to the jury, she actually testifies differently. Jury trial, she talks about storage units, which she had never disclosed before. Jury trial, her amount, her quantity is increased. Jury trial, she starts talking about vehicles, a Hummer, an Escalade, and these types of vehicles. Her testimony was impacted by these cash payments, because it did change. What was the first thing you said was new? Storage units. Storage units. Different types of things that, of course, we look at and say, well, boy, that's drug dealing. But those things weren't disclosed previously. And so I could cross-examine her on the fly based on that new testimony, but I didn't know why or how that was influenced or why. Part of it was the cash, I believe. $100, $150. You know, I bought breakfast here in St. Paul this morning. I can tell you that $100 goes further in Sioux Falls than it does in St. Paul. And $100 in certain areas goes further in other places than it does in Sioux Falls. We're talking about payments that are strictly cash, where there's no accountability, and we have no idea where it's going to be going for. Whether or not it's the Sioux Falls Police Department that's doing this, where they have a drawer full of cash that they can basically use, not disclose to anybody, not tell anybody about, or whether or not it's any other local police department around. That's why I'm calling for, because I don't know of anything else to do, you know, basically a Bright Line rule. When cash is used, it must be disclosed. Because that's the only way that we would be able to know that, in essence, whether or not these informants are being motivated by something which we would otherwise consider to be black market. You know, basically the government would be allowing just this cash game, cash flow. If this is affirmed, we would basically be allowing local police departments to use cash, giving them no real incentive to notify prosecution, let alone the defense. And that's really concerning for confidence not in this verdict, but in confidence in all the drug conspiracy cases, to determine whether or not those informants had been paid in cash. You could say it was error, but that it wasn't prejudicial, right? That it should have been turned over, you should have had that in your arsenal of things to use on cross-examination. But does this really kind of fall on the prejudice, Ron? I understand that's the district court's ruling and, you know, the issue that we're focusing on is whether or not this is prejudicial, whether or not this is material. And that's when you look at her testimony in the context of everything. You know, basically the other evidence was law enforcement. Found some 13 grams on my client's possession. Otherwise it's law enforcement police officer's testimony that was not influenced by Ms. Ghost and her testimony was influenced by the money. So we have law enforcement. If you take away where her influence lies, all you have is the 13 grams that was found on my client. Not enough for even the 50-gram count. So when her testimony influenced the other individuals or the jury's perception of the other individuals, giving them more credibility. She knew my client the longest. She knew my client the best. They were partners for six years. It's one of those situations where this person was side-by-side, according to the government, the entire time. So that testimony, great credibility to the jury, basically came in unimpeachable because, as she said, she had nothing to gain for testifying. So it was very hard for me to tell the jury that some of this bias and motive is not pure. And that's where I think this money comes in. And that's how I think this case should be decided because, you know, when her testimony impacts the others, bolsters the others, the witnesses that are coming later, it does impact their credibility. And it tells them that, oh, Blanca is probably more credible because Margaret knew him. Chua is more credible because Margaret knew him. Jose Rivera Perez is more credible because Margaret knew him. And those were the only lay witnesses they had. So she bolstered all the other credibility of all the other witnesses just by the presence of her saying their name or just by the fact that she mentioned the yellow Hummer and things of that nature. And that's where it's material. Because I think it's reasonable to, the probability is that we'd have a different outcome. More than that, it comes with the confidence of the jury verdicts with this one and others because this one's motivated by cash. We know that now. You know, my client told me, I guess I'll say it's through the rumor mill of the penitentiary that she was paid money to testify. I didn't really honestly believe him a whole lot right away because I thought that would have been disclosed. So I subpoenaed the Yankton County Jail records and lo and behold, it came back and it showed this payment. Honestly, I was surprised. But it showed that he was truthful, she was not, and that money was a part of this. And how many other cases that I've had, other people have had, where the drug conspiracies have informants and evidently there's a drawer of cash that's being used. Agent Harvison, over 30 years of experience with DEA, said this was an insignificant payment but yet typical. And that's very concerning. When you have a DEA agent who says this is typical. More concerning is that we have the two payments before. Spaeth signed up on one of them, Agent Spaeth. He had one witness who I think the name was Nelson, another witness who was Conley. So we had three agents who knew about these payments. None of them told law enforcement. None of them told the prosecution. Including a federal agent? Yes. Yep. So this is not one agent doing something rogue. This is a part of their system. This is something where they should have policies and evidently they don't about turning this stuff over to the law enforcement, or I'm sorry, to the prosecution. Or law enforcement doing this basically on their own. Now we have the payment afterwards, was at the direction of Spaeth. Cunningham made it and then there was another individual who was involved with that to the county jail. A total of six were involved that knew that this person got paid before I did. None of them told the prosecution. And that's why I think the remedy must be the new trial. And it must be granted in order to make sure that law enforcement, if cash is involved, must be disclosed. Otherwise, I'd reserve my time unless you have a question, Judge. Thank you. Very well. You may save the time for rebuttal and we'll hear from Ms. Mamenga for the government. May it please the court, counsel. My name is Jennifer Mamenga and I'm an assistant United States attorney for the District of South Dakota. I was trial counsel in this case and did represent the government through the motion for new trial. I am here today to ask this court to affirm the district court's decision to deny the defendant's motion for a new trial due to a purported Brady violation. As we noted at the district court level, we do agree with the district court's determination concerning the defendant's Brady claim insofar that there was favorable evidence to the defendant that was not disclosed before the trial. However, it is our contention, supported by the district court's finding, that that evidence was not material. Because the evidence of the $400 worth of payments made to a government witness, Margaret Ghost, was not material, the district court did correctly find that the defendant is not entitled to a new trial and that Brady was not violated. Do you agree with the description that she was really difficult to cross-examine and this would be the one thing that would provide the jury with an understanding of a potential motive? I don't agree with that contention by the defense. Ms. Ghost came to the trial in jail clothing, initially on direct, testified, I'm being housed at the Yankton County Jail on a writ for purposes of testifying at this trial. I'm residing in the South Dakota Women's Prison where I'm sitting on a parole violation. She detailed that she had three prior felonies, detailed a long history of methamphetamine use, detailed a long-term relationship with this defendant where they had multiple children together. What about a motive to, I understand your general credibility as to you've been in trouble before, you're sitting in jail, but a motive to actually exaggerate, perhaps stretch the truth, try to corroborate things that she wouldn't. What else would be her motive other than this money? Was there anything else at trial that was available for cross-examination of her? From my view, it was the ending of her relationship with Orlando Donas Vargas. So this is a woman who has lost custody of her four children, has been left various times. She testifies by this defendant while he's dealing drugs and she's dealing with the children. And this is a woman who, I mean, for all intents and purposes, appears to be a woman scorned, testifying to the jury about her involvement with this defendant. So I think that that did give Mr. Colbeck some fodder for cross on why you were here, why you're saying what you're saying about this defendant. And that was a line of cross during the trial? It was, Your Honor, yes. And it was also presented on direct that their relationship had ended by the time that she took the stand at trial. Evidence in terms of a Brady violation is material when there is a reasonable probability that the result of the trial would have been different if that evidence was disclosed. Ultimately, we're looking to see whether or not the jury's verdict confidence has been undermined. And in this case, that has not happened. Here, even if evidence of that $400 worth of payments would have been disclosed, and prior to trial that would have just been $250 worth of payment, the result would have been the same and the verdict certainly is not undermined. That goes, as I was going to get into, but Judge Kelly, you brought up the jury's impression of Ms. Ghost. She was a crossable defendant. She was not unblemished before the jury. She came and Mr. Colbeck certainly was able to cross her on any inconsistencies that came up between her prior information she gave to law enforcement and at the trial and for  You probably have to add in the latter part of the money, too, in the analysis, wouldn't you? Because the testimony would probably be, well, or the cross-examined, well, you've received two different payments and you're hoping to get some more, right? Yes, Your Honor. And at the district court level during the evidentiary hearing, I took the position that we would not have to disclose that payment. In reviewing this further, I do believe that that subsequent payment would have to be disclosed under our Brady obligations. Why? It wasn't even, it hadn't even been paid at the time of the trial. At the time of the trial, she had been paid the two prior payments. I think in- How could you even have disclosed the third payment? I couldn't have disclosed the third payment in advance of trial. I could have disclosed it in advance of sentencing once I learned about it. I did not learn about it, though, until Mr. Colbeck began the subpoena process. How would it have affected the sentencing? Did Ghost testify again at the sentencing? Ghost did not testify again at the sentencing, but- So how would it be relevant? In the pre-sentence report, approximately six pounds of methamphetamine was attributed to Mr. Donius Vargas from Ghost. So giving really every inference to Mr. Donius Vargas at this point, every benefit, for me to disclose that would have probably been out of an overabundance of caution, but- There's nothing wrong with disclosing it. I just don't understand how it would be a Brady violation. And I may not be forced under Brady to disclose it. This court has not weighed in on Brady being implied really past that trial level. So for that reason- I'm just trying to understand how it would be used to impeach the witness. I thought the whole point was this money would, the payments could be used to impeach her, but if she wasn't testifying anymore- It certainly wouldn't be used as direct impeachment, but maybe casting a light on her testimony generally to the district court. Again, I don't think it would move the needle. I guess it might corroborate that she was expecting more or something if that was part of the argument. Yes. And if that was part of the argument, certainly. What about this argument that's being advanced that while materiality here may not be, I mean, you just deal given the small amounts of cash here, but it appears to be the practice that we're handing out walking around money to people that we expect to testify against folks. And these are people to whom every hundred dollars is a matter of life and death to them in some ways, right? Because if I can't get my next high, I'm not sure I'm getting through life, right? I mean, if you think about how addicts think, feel, if you imagine what withdrawal looks and feels like, this is a real thing. And if we got a bunch of officers walking around doing this all the time and nobody knows, it's bad for the system and undermines our confidence in the entire system. Because while they can't buy you or me with a hundred dollars, there are a lot of desperate addicts we can buy for $35 if that's what it takes to get high. And I understand that argument. I don't know that it fully squares with the Brady definition of materiality, which is the issue, I think, that's before this court. But when we do look at that type of practice, so to say, and then I look at the facts of this case and what's before this court, we're talking about a woman who gave information to law enforcement for almost four years before she ever received a payment. So this is not a woman who was, you know, if you come and sit down, we promise we're We've got no evidence of that on the record. We have evidence of a November 1st, 2017 $100 payment for about four years worth of information. Detectives Faith estimated that she'd given information on 11 to 15 people by that time. The next week she got paid another $150 amount for information in a totally separate case that led to somebody's arrest. Then the additional $150 payment after she testified, after she called Detectives Faith and said, I have no money at the Yankton County Jail. I need personal effects. Can you please help me? So I wouldn't- Other than the record of the deposit, I'm assuming at the jail, that's how it was subpoenaed, correct? Yes. Excuse me. Was there any record of this money being given out from the law enforcement itself? In other words, were they keeping track of the money that was being paid out to various witnesses or potential witnesses? Yes, Your Honor. As in the new trial, or the motion for the new trial evidentiary hearing, Exhibits 1 and 2 are receipts that pertain to those November 1st and 7th payments. I did not offer an additional receipt from DCI as that was given as the jail receipt. I gave that as the exhibit. But they do keep a log system of this. As I noted at the district court level, it is simply something I didn't inquire about and something that did not come up during trial preparation. So if one wanted to seek out the information, it does exist in a recorded fashion. I just was not aware that we were in a practice of paying people for information versus doing a controlled by situation, which has been the vast majority of my other cases where I've used a cooperating witness. So the U.S. Attorney's Office could put in place a procedure to make sure this information is discovered? Absolutely. And that already has been done. It certainly has changed. So the court, this idea that it's bad for the system can be addressed by the U.S. Attorney and the law enforcement agency? Absolutely. And it has been. Do you think the court has any authority to order disclosures that aren't required by Brady? Under Brady and its progeny, I don't see where the court would have authority to order that necessarily. I think that . . . Do you think it's being handled by . . . Absolutely. . . . the law enforcement side? Absolutely. And I would note, I think that there was maybe an inaccuracy during defense counsel's presentation. No federal agent at any point ever signed off on this. Agent Harvison was not aware or involved in this process of the working with Ms. Ghost leading up to the trial. He became more involved as we sat down to do a trial preparation and still adopt . . . You can ask the state and local people, right? Absolutely. Yes. You can ask them were there any payments. Yes. And that is being done in every trial that goes on in our district now. So that has certainly, for me, been a learning experience and something that we won't let slip by again. And when they said it wasn't, what was the phrase? They said, well, this happened fairly routinely. Is that referencing just payment of witnesses and then that's disclosed and everyone knows? Or was it fairly routine that this particular situation was happening, that witnesses were being paid and that was not being turned over to the prosecution? My understanding, when they use the term fairly routinely, that dealt with the payment of individuals who are working more as confidential informants doing controlled by type work. So in my legal experience, those are the kind of vouchers I'm getting are, obviously, this person's being paid because they've shown up here today, they've done this by, they've been wired up, and then a payment's exchanged. I think the situation with Ms. Ghost, where she's been paid for information, is much more rare. This has certainly caused me to look back at all of the cases that I've done with the Sioux Falls Police Department. I can't think of another one where this has been either an issue where an SOI has been paid, and very few cases really where we have just a pure source of information coming to testify at a trial. You mean you followed up and spoke with the police department about those previous cases? Yes. So I could think of maybe one or two other cases where I had a source of information testify at all and that person was not paid. When we look at the individuals who we do have testify, you know, in that consideration under Brady of the weight of the total evidence of this trial, we're looking at other individuals who are getting a favorable plea agreement for coming to testify. That's generally the type of witnesses that we have at the federal level in the District of South Dakota on a drug case. So Blanco, Lunasoto, Edristou, Lemus, they would fall right into that. Well, in fairness with these state officers, this is not all that uncommon with kind of like ordinary street crime kind of things. Like they go up to the homeless guys and say, you know, there's maybe 10, 15 bucks on if you tell me you heard anything about, you know, this building has been vandalized, you hear or see anything. I mean, and that's not unheard of, right? And so as far as the state officers in the BCI, I mean, they're investigating all these kind of crimes as well. And so it's, you know, it's kind of understandable how they might have missed this as being the Exactly. And I think that also looking at it through the lens of the regular work with a confidential informant, the regular payments that get made to that person working over a duration of time, where we are talking about what Agent Harvison says in the thousands of dollars, those are readily on the front of everyone's mind. And they're disclosed routinely. Yes, absolutely. In this case, we are looking really at a mountain of other evidence against this defendant. Aside from Ms. Ghost, we've got the Minnehaha County Jail Correction officer who testifies that he locates a half ounce of methamphetamine falling out of the defendant's underwear when he's getting booked into jail. That alone would really meet the elements of that five grams of actual methamphetamine possession with intent to distribute count. We've also got post arrest, this defendant admitting to Officer Puente that he was in possession of methamphetamine and that in the past, he's provided it to individuals he refers to as crackheads. We've also got the testimony of Jose Rivera Perez. And I would note that he was not testifying pursuant to a plea agreement or a promise of a Rule 35 or 5K. He had no agreement with our office or any other prosecutor's office at the time that he did testify. And he detailed approximately five years of involvement with this defendant, seeing him with amounts from a half gram to two ounces of methamphetamine on regular occasions for distribution, discusses brokering deals for other people, including the trade of methamphetamine for a gun. And in sum, the multiple pounds that Blanca Lunasoto and Edrost Chualamu testified about to the jury also show that the absence of or the damage of Ms. Ghost's testimony really was not going to move the needle in this case. OK. Your time has expired. For that reason, we'd ask that you affirm. Thank you. Thank you for your argument. Mr. Kolbeck, we'll hear from you in rebuttal. The United States Supreme Court in Banks v. Dredke determined that $200 was enough for a Brady violation. When reading that decision, I do agree that I think it sounded like the Supreme Court was more upset about the prosecution's failure to disclose that because they knew about it through post-conviction proceedings. And they never did make the record clear. And they sat and watched somebody lie about whether or not they received any money. But $200 was enough there. And I think $250 is enough here because we have a similar type of viewpoint from law enforcement, who says that we can pay cash and not tell anybody. What we have here was, and I apologize if I thought Spaeth, because they're in the drug task force. And they're all kind of working together in a lot of different things. But if he is the state agent, he does give her cash, $100, then $150. He writes it down. He puts it in some log. Another person witnesses it on November 1 and on November 8 of 2017. And then on January 29, she's testifying. So we're not talking long-term between payments and long-term between any kind of payment. This trial was upcoming. They're talking about the trial. Are they in distinct trial prep mode? Not really. But we do know that this trial is set up for the late January. And this is just a few months before. So it's not as if this is something that's just money over here, money over here. This is somebody who Spaeth was one of their key witnesses, second to last, basically. And a person who had a lot of knowledge about what was going on and then did pay cash to this informant. I could cross-examine her on inconsistent statements. I could cross-examine her about the relationship. But when it gets down to the bias and motive, that was two areas where when you're dealing with informants, you should have broad latitude. And it is something where we had no idea. This is the Sioux Falls Police Department. And I know Ms. Mamaga in the U.S. Attorney's Office is making changes with the individuals. The judge asked about that during the evidentiary hearing. And that's going to be happening, I believe. Well, I also know that people change positions. Not that they would change their viewpoint, but people change positions. We're going to have a different U.S. attorney. We'll have different agents. And this is just basically one police department in one district in eastern South Dakota. That's concerning to me. I obviously raised the alarms that I could to the defense lawyers around in the community that I could that, make sure you ask for this. County prosecutors know about it, too. It doesn't happen everywhere else. That's the best I can do. That's where I think this court, with your ability to reach the masses, should make sure that this case is reversed so that everybody knows that this is serious when you're dealing with cash and when you're dealing with informants. Because we, compared to other cases, this is not something where it's purpose-driven. This could have been used for anything. In fact, I think it's very reasonable that it was used for methamphetamine. She was asked on page 21 specifically, what do you expect will happen for you coming here to testify? And she answered, nothing. Shortly before that, she was talked about the absence of a plea agreement. We know that's not true, because within a day or two, she asked for money and she received it. She was three for three, asking for money and getting paid. So I'd ask you to take that into consideration and determine that that decision to deny the motion for a new trial was an abuse of discretion. Thank you. Very well. Thank you for your argument. The case is submitted and the court will file an opinion in due course. Thank you to both counsel. You are excused.